UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                          CASE NO .

**JERRY MICHAEL HOLLANDER**                                     **04-14550**
**SHEILA STORY HOLLANDER**                                      SECTION A

DEBTORS                                                         CHAPTER 7

**ROBERT SIGILLITO, ET AL**                                     ADVERSARY NO.

PLAINTIFFS                                                      **04-1193**

VERSUS

**JERRY MICHAEL HOLLANDER, ET AL**

DEFENDANTS

## MEMORANDUM OPINION

The Court held a trial in the above-captioned adversary proceeding on July 11, 2008 through July 15, 2008 and August 28, 2008.  At the conclusion of the trial, the parties requested additional time for post-trial briefing.  The Court set a deadline of October 10, 2008, and subsequently extended the deadline to October 24, 2008, for the filing of post-trial briefs, after which the Court took the matter, as well as the admission of Exhibit 43,  under advisement.

### I.  Facts

 In August 1994, the debtors, Jerry and Sheila Hollander ("Hollanders" or "Debtors") moved into a house located at 2665 Claiborne Street, Mandeville, Louisiana ("Claiborne House").  Approximately two years after moving in, Mrs. Hollander noticed that the wood floors were warping.  By August 2000, the wood floors on the first floor of the Claiborne House had completely buckled.    At this point, the Hollanders filed a claim against Allstate Insurance Company ("Allstate"), their homeowners insurer.

After receiving the claim, Allstate hired Quick & Associates, Inc. ("Quick") to inspect and investigate the cause of the problem. On September 28, 2000, after inspecting the Claiborne House, Quick issued a report to Allstate ("1st Quick Report"). The 1st Quick Report stated:

> The proximate cause for the cupping and/or buckling of the wood floors throughout the dwelling is a direct result of induced expansion of the wood floor from absorption of moisture from the subfloor within the crawl space of the dwelling.[1]

The report notes that "the ventilation openings" in the crawlspace are "inadequate to allow sufficient air flow throughout the crawl space."[2] Allstate then denied the claim.

As a result of the 1st Quick Report, the Hollanders were aware that substantial repairs were necessary.[3] Because Allstate denied responsibility under the policy, the Hollanders were forced to shoulder the costs of repair themselves. The extent of the repairs required the Hollanders to move out of the Claiborne House. This, coupled with an adverse turn in Mr. Hollander's business, required the Hollanders to downsize.

In September 2000, the Hollanders met realtors Earl and Marilyn Mendoza while looking for a less expensive home.[4] On September 29, 2000, the Hollanders bought their current house at 271 Evangeline Drive, Mandeville, Louisiana ("Evangeline House"). The Mendozas were the realtors for the sellers of the Evangeline House.

---

[1] Exhibit 7, p. 7-13.

[2] *Id*.

[3] As of September 2000, the Court finds that the Hollanders were not specifically aware of the extent of the repairs needed, but they did know that, at a minimum, the entire first floor would have to be relaid.

[4] Tr. T., July 15, 2008, p. 286.

On November 15, 2000, the Hollanders hired Catalano Flooring ("Catalano") to remove the insulation from the crawlspace.[5]  Then on December 18, 2000, the Hollanders moved from the Claiborne House to the Evangeline House and Brandon Construction Co., Inc. ("Brandon ") was hired to make the necessary repairs.[6]

Because the exact cause of the problem could not be determined without removing at least a portion of the floor and subfloor, Brandon's initial task was to expose the subflooring system.  In January 2001, Brandon inspected the subfloor joists and discovered that they were substantially damaged due to rot.  Because the subflooring was now exposed, Quick performed a follow up inspection and issued a second report ("2nd Quick Report").  The report concludes that the buckling "occurred as a direct result of design and/or construction installation defects."[7]

> Specific defects referred to immediately above include, but are not limited to, the placement of insulation on the bottom side of the floor system and the placement location of the felt paper barrier between the 1-by-6 decking and plywood subfloor. This system provided for the dew point line occurring within the floor system thus allowing the formation of condensation and absorption into the component parts of the floor system.[8]

The 2nd Quick Report makes a recommendation for restoration:

> The required damage restoration will include complete removal and replacement of the floor system commencing with the 1-by-6 decking through the Brazilian cherry wood flooring, and removal and replacement of the structural floor joists throughout the dwelling, the extent and limits to be comprehensively determined. ... A professional designer should be consulted regarding the design details of the floor

---

[5] *Id.* at  p. 255-256.

[6]  Exhibit 11.

[7] Exh. 7 at 7-10.

[8]  *Id.*

system replacement to assure that the same condition does not occur to the replaced floor system in the future.[9]

As a result of Quick's recommendation, Mrs. Hollander consulted with the National Oak Flooring Manufacturer's Association ("NOFMA") regarding the proper installation of wood plank flooring.[10]   Catalano gave Mrs. Hollander a NOFMA pamphlet detailing the construction of subflooring installation; Mrs. Hollander also called the NOFMA "technical assistance line" with questions.[11]   To ensure proper ventilation, on Brandon's advice, the Hollanders did not replace the original insulation removed by Catalano, installed ventilation fans in the crawl space, and a new vent hole in the chain wall closest to the front porch.[12]   Finally, after the floor replacement was completed, the Hollanders had Catalano spray an antimicrobial spray in the crawlspace[13] and a visqueen[14] barrier was tacked to the ground under the entire house.

Having bought and moved into the Evangeline House, the Court concludes that the Hollanders expected to sell the Claiborne House after the repairs were complete.  Although Quick was not employed by the Hollanders, Mrs. Hollander sought his advice regarding the proper repair of her home and whether or not once the repairs were complete the "defects" he had identified would be remedied.  Specifically, she was concerned about disclosing the pre-existing defects to potential

---

[9] *Id.*

[10]  Exh. 5 at 260-261.

[11] Tr. T., July 15, 2008, p. 260.

[12] *Id.* at p. 307.

[13] *Id.* at p. 256.

[14]  While the Court is aware that Visqueen is a trade name, the Court is using "visqueen" as the vernacular term for polyethylene or plastic sheeting, as did the witnesses.

buyers.[15]   Quick advised that if professional recommendations were followed, there would be no more defects.[16]  The implication being that disclosure was unnecessary.

On May 17, 2001, the Hollanders filed suit against the original builder, insulation company, and floor finisher of the Claiborne House ("Builder Suit").[17]

In May 2001, the Hollanders listed the Claiborne House for sale with Stephanie Mack of Stirling Properties.[18] On May 20, 2001, Mrs. Hollander signed a property disclosure statement indicating, "Entire wood flooring replaced - poor millwork of initial flooring" ("Original Disclosure").[19]

On October 3, 2001, the Hollanders changed realtors.  They listed the Claiborne House with the same realtors that had sold them their Evangeline House, the Mendozas.[20]   They signed a property disclosure statement indicating, "Replaced glued down Brazilian cherry flooring with nailed down flooring throughout first story" ("Second Disclosure").[21]

In connection with the Builder Suit, Coastal Insulation Co., Inc. ("Coastal") hired Vanderbrook Engineering Company to inspect the Claiborne House.  On December 19, 2001, Fred Vanderbrook  issued a report to Coastal post-dated to May 21, 2002 ("1st Vanderbrook Report").

---

[15] Tr. T., July 15, 2008, p. 230-232, and Exhibit 7, p. 2, ¶ 8.

[16] *Id.*

[17] *Hollander v. Coastal Insulation, of Louisiana, Inc., et al*, 2003-11462G, 22nd Judicial District Court, Parish of St. Tammany.  Exhibit 1.

[18] Tr. T., July 15, 2008, p. 273.

[19] Exhibit 14.

[20] Exhibit 16.

[21] Exhibit 15, p. 2.

5

The 1st Vanderbrook Report concludes that the floor buckled due to high moisture content in the crawlspace[22] which was still present.   The Hollanders did not see the report.

Almost a year after the repairs had been completed, the plaintiffs, Robert and Rhonda Sigillito ("Sigillitos") agreed to purchase the Claiborne House and signed a Purchase Agreement.[23] Earl and Marilyn Mendoza represented both the Hollanders and Sigillitos, who signed a Consent to Dual Agency.[24]   The sale was subject to the house passing inspection.

James G. Gilbert of Gilbert Engineering Services, LLC was hired by the Sigillitos to inspect the Claiborne House prior to the sale.   He conducted the inspection on March 13, 2002, and issued an inspection report to the Sigillitos ("Gilbert Report").[25]

The Gilbert Report provides:

> There is a light black discoloration of the floor joist and sub-flooring.  This appears to be fungi which is associated with poor ventilation.   Two vent fans have been added in the crawl space and visqueen has been placed on the ground in the crawl space.  This has been done to improve ventilation; however, ventilation openings in the walls are covered with felt paper.  This should be removed.  With the exception of the felt over the ventilation opening, the steps taken to correct the problem are in line with those generally recommended; however, there was moisture on the visqueen.  A portion may be due to the lawn and shrub sprinkler system and a portion may be due to lack of cross ventilation due to the ventilation openings being covered with felt.  A discussion of wood destroying fungi has been included at the end of the inspection section.[26]

_____

[22]  Exhibit 37.

[23] Exhibit 15.

[24]  Exhibit 18.

[25] Exhibits 31 and 32.

[26] Exhibit 31, p. 4.

6

As a result of Mr. Gilbert's inspection, the Sigillitos submitted a Property Condition Clause Response,[27] asking the Hollanders to repair the air conditioner and replace a door.   The Hollanders agreed to correct the items indicated.   The Sigillitos did not request any additional repairs, nor did they question the source or cause of the moisture identified by Mr. Gilbert.

The act of sale transferring ownership of the Claiborne House from the Hollanders to the Sigillitos took place on March 29, 2002,[28] shortly after which the Sigillitos had four (4) coats of polyurethane added to the wood floors.   When the flooring contractor arrived to apply the polyurethane, he commented that the floors were cupping.   Multiple coats of polyurethane were ultimately applied because the new, initial layers were cloudy.[29]

Over the next several months, the Sigillitos began to notice mold on the walls of the downstairs walls and kitchen cabinets.[30]  In July 2002 when the problems persisted, Mr. Sigillito asked Mrs. Hollander if she had experienced any problems with floor cupping while living in the house.[31]  She denied any problems.

In December 2002, the Sigillitos learned of the Builder Suit.[32] Suspecting that their problems were connected with those complained of in the Builder Suit, Dr Sigillito wrote a letter to Mrs.

---

[27] Exhibit 21.

[28] Exhibit 30.

[29] Mr. Sigillito testified that he wanted two coats of polyurethane put down, but they ended up with four coats because the first coats were drying cloudy. Tr. T. July 15, 2008, p. 27, ll. 23-25.

[30] Tr. T., July 11, 2008, p. 36.

[31] *Id.* at p. 37.

[32] *Id*. at p. 46-47.

7

Hollander advising her of a moisture problem, warping wood floors, and mildew growth.[33]   Dr.

Sigillito asked in his letter if the Hollanders had moisture or mildew problems in the Claiborne

House.   He also asked who installed the wood floors and fans in the crawlspace.  The Hollanders

did not reply.

Almost six months later, the Sigillitos hired Lawrence Blanchette of Associated Design

Group, Inc. who performed an inspection of the Claiborne House.   Mr. Blanchette's report dated

June 25, 2003[34] suggested two alternatives for remedying the problem: (1) "Installation of Floor

Insulation and Vapor Barriers," or (2) "Temper the air in the crawl space through

dehumidification."[35]  The Sigillitos chose the latter option and in the summer of 2005 (two years

later)  removed the visqueen and fans from under the house, completely closed the crawlspace

except one entry which was covered with visqueen, and installed two temporary dehumidifiers.[36]

On March 26, 2003, the Sigillitos filed suit against the Hollanders in St. Tammany Parish

seeking either reduction in the purchase price, payment for repair expenses,  or rescission of the sale

due to redhibitory defects.[37]

---

[33] Exhibit 35.

[34] Exhibits 41 and 42.

[35] Exhibit 41, p. 4.

[36] Tr. T., July 15, 2008, p. 28-29.

[37] *Sigillito v. Hollander*, civil action no. 2003-11462, 22nd Judicial District Court. Parish
of St. Tammany.   Exhibit 2.

The Sigillitos had the subfloor and joists under the Claiborne House scrubbed and painted

with antimicrobial paint.  In June 2007, the Sigillitos had permanent dehumidifiers installed in the

crawlspace and inside of the house.[38]

## II. Law and Analysis

### A. Redhibition

Generally, the seller of a home impliedly warrants to the buyer that it is free from
redhibitory vices or defects. La. C.C. art. 2520. A defect is redhibitory, entitling the
buyer to rescind the sale, when it renders the home useless, or makes its use so
inconvenient that it must be presumed that the buyer would not have bought the
home had he known of the defect. La. C.C. arts. 2520. A defect is also redhibitory,
entitling the buyer to reduction of the price, when, without rendering the home
totally useless, it diminishes its usefulness or its value so that it must be presumed
that a buyer would still have bought it but for a lesser price. La. C.C. art. 2520.

However, not all redhibitory vices or defects justify rescission or reduction of the
price. Apparent defects, which the buyer can discover through a simple inspection,
are excluded from the seller's legal warranty. La. C.C. art. 2521. A defect is apparent
if a reasonably prudent buyer, acting under similar circumstances, would discover
it through a simple inspection of the property. A simple inspection is more than a
casual observation; it is an examination of the article by the buyer with a view of
ascertaining its soundness. *Amend v. McCabe,* 95-0316, p. 9 (La.12/1/95), 664 So.2d
1183, 1188. Factors considered in determining whether an inspection is reasonable
include the knowledge and expertise of the buyer, the opportunity for inspection, and
assurances made by the seller. *Crow v. Laurie,* 98-0648, p. 6 (La.App. 1st
Cir.2/19/99), 729 So.2d 703, 707-708.[39]

The problems experienced by the Sigillitos are due to the improper ventilation of the

crawlspace.  This allowed the humidity level in the crawlspace to rise.  During the summer months

when the Claiborne House was air conditioned, the air temperature inside the house dropped below

that outside.  This caused the floors to cool.  When the moist hot air in the crawl space reached the

---

[38] *Id.* at  124-125.

[39] *David v. Thibodeaux*, 916 So.2d 214, 217, 2004-0976 (La.App. 1 Cir. 5/11/05).

cool subfloor, condensation developed.  Over time the condensation caused a cupping of the floors and eventually caused mold to develop.  The question remains as to what caused the problem and when it developed.

The Court concludes that the Claiborne House, when originally built, had a design defect. The 1st Quick Report identified the existence of moisture in the crawlspace and the 2nd Quick Report confirmed its source.  Testimony at trial revealed that the brick apron surrounding the raised pier construction foundation contained an inadequate number of openings to allow sufficient cross ventilation throughout the crawlspace.  In addition, the crawlspace was not open underneath the house but instead contained a honeycomb of chain walls which divided it into separate sections. This further impeded the flow of air through the crawlspace.  The combination was disastrous and resulted in substantial damage to the house due to moisture build up.[40]

The Hollanders expended over $40,000.00 to replace the damaged wood and flooring.  They followed the advice of professionals in the field and spared no expense in attempting to correct the problem.  They removed the insulation under the subfloor, placed ventilation fans in the crawlspace to force circulate the air, tacked visqueen on the ground as a vapor barrier, and cut additional openings in the apron surrounding the foundation.  At the conclusion of the repairs, the Hollanders had no reason to believe that the problem was not solved.  The Court finds the Hollanders' testimony on this point credible, and therefore, finds that the Hollanders did not know of the defect at the time of the sale.

---

[40] Mr. Blanchette testified that as a result of these types of problems, the writers of building codes are debating whether to require crawlspaces to be closed off and air conditioned. Tr. T., July 14, 2008, p. 310.

10

The Sigillitos hired Mr. Gilbert to inspect the Claiborne House prior to the sale.  Mr. Gilbert was not aware that the entire flooring system had been replaced but noted the existence of some fungi on the joists and subfloor, two ventilation fans in the crawlspace, and visqueen on the ground.

 The Gilbert Report states:

> With the exception of the felt over the ventilation opening, the steps taken to correct the problem are in line with those generally recommended; however there was moisture on the visquin.  A portion may be due to the lawn and shrub sprinkler system and a portion may be due to lack of cross ventilation due to the ventilation openings covered with felt.[41]

To counter the evidence that the moisture problem existed at the time of the sale, the Hollanders direct the Court to several changes in the flooring performed by the Sigillitos shortly after the sale. The Hollanders argue that because the Sigillitos added four coats of polyurethane, the floors were "sealed" trapping moisture in the subfloor and ultimately causing the Sigillitos' problems.

While the Hollanders allege that the additional coats of polyurethane caused the problem, the Court is unconvinced.  Prior to the sale, the Hollanders had already put two coats of polyurethane on the floor, for all purposes "sealing" them.[42]  After the sale, the Sigillitos' flooring contractor noted a slight cupping of the floors[43] indicating the presence of moisture.  This was prior to the application of any additional coats of polyurethane.  An additional indication of moisture followed when the first two additional coats  of polyurethane did not properly dry.[44]

---

[41] Exhibit 31, p. 4.

[42] Tr. T., July 14, 2008, p. 318-319.

[43] Tr. T., July 11, 2008, p. 32.

[44] Id. at p. 33-34.

The Gilbert Report, the cupping of the floors after sale and prior to the application of any additional coats of polyurethane, as well as the cloudy nature of the additional coats leads the Court to conclude that the moisture problem in the crawlspace persisted at the time of sale despite the Hollanders' best efforts to correct the problem.  The Court finds that the defect is not the amount of polyurethane, but a moisture problem in the crawlspace created independently of the additional top coats.

Having established that a defect in the crawlspace existed at the time of sale, the Sigillitos argue that the defect was latent and unknown by them.  They further allege that the Hollanders knew of the defect and concealed its existence.  As a result, they are requesting the return of the purchase price with interest, the costs of sale and preservation of the property, the costs of repair and improvement to the property as well as attorneys fees and other damages.  A seller who knows of the defect and fails to disclose it, is liable for the return of the price with interest from the date of sale, reimbursement of the reasonable expenses of sale, and those incurred in the preservation of the thing as well as damages and reasonable attorney fees.[45]

The Hollanders counter that they believed the problems in the crawlspace had been corrected, and therefore, had no knowledge that any defect existed.  To support this position they direct the Court to the Gilbert Report which identified the problem but concluded that it had been remedied. A seller who does not know of the defect, is only bound to repair it.[46]  Therefore, the Hollanders argue that even if the defect existed, they are not responsible for a return of the purchase price with interest, the damages or attorneys fees claimed but merely the costs of repair.  However,

---

[45] La. C.C. Art. 2545.

[46] La.C.C. Art 2531.

12

the Hollanders dispute even this responsibility as they also allege that the Sigillitos were made aware of the problem prior to the sale.

A seller owes no warranty for defects that were known to the buyer at the time of the sale or that should have been discovered by a reasonably prudent buyer.[47]  The Hollanders argue that the Gilbert Report indicated that a moisture issue in the crawlspace existed due to improper ventilation. Therefore, if the defect existed, it was not latent or unknown at the time of sale.  A plain reading of the Gilbert Report indicates that a ventilation problem exists in the crawlspace but is attributed to a closed opening in the apron wall.  Mr. Gilbert notes that "with the exception of the felt over the ventilation opening, the steps taken to correct the problem are in line with those generally recommended."

The Sigillitos claim that because Mr. Gilbert did not know of the previous problem with the floors, he believed that the small amount of mold he saw was insignificant given the age of the house.[48]  Unbeknownst to Mr. Gilbert, the mold was newly formed.  They further argue that the Gilbert Report alerted the Hollanders, given their personal knowledge of the house's history, that the moisture problem persisted.  Since the Hollanders failed to disclose the house's repair history, the severity and extent of the problem was hidden and, therefore, not discoverable by a prudent buyer.

The existence of a presale inspection cuts both ways.  On one hand, the Gilbert Report notes evidence of a previous problem.  The Sigillitos did not follow up or question the Hollanders

---

[47] La. C.C. Art. 2521.

[48] Tr. T., July 15, 2008, p. 166-167.

13

regarding the issue, nor did they investigate further.  On the other hand, the fact that Mr. Gilbert

believed the problem was minor and had been remedied weighs in favor of a hidden defect.

> Typically, when *all* of the [] damage is concealed within the home's structure (e.g.,
> walls and floors) it is considered unapparent because it is not discoverable by a
> simple inspection. *Pursell, supra,* (discussing, with approval, *Ruehmkorf v.
> McCartney,* 121 So.2d 757 (La.App. 2d Cir.1960), and *Foreman v. Jordan,* 131
> So.2d 796 (La.App. 3d Cir.1961)). See e.g., *Abdelbaki v. University Presbyterian
> Church,* 380 So.2d 35, 37 (La.1980); *Fraser v. Ameling,* 277 So.2d 633, 638
> (La.1973). In such situations, there is no obligation on the part of the buyer to inspect
> further. *Fraser, supra; Pursell, supra.* On the other hand, when *some* of the []
> damage is detectable by a simple inspection, the buyer has a duty to investigate
> further. If he chooses to purchase the home without further investigation, he waives
> the right to sue for redhibition or reduction based upon the [] damage. See, e.g.,
> *Pursell, supra; Ingraffia v. Coleman,* 467 So.2d 616 (La.App. 3d Cir.1985);
> *Bonhagen v. Hooper,* 195 So.2d 447 (La.App. 4th Cir.1967), *writ denied,* 250 La.
> 634, 197 So.2d 652 (1967).[49]

The Gilbert Report indicates that the appropriate steps had already been taken to remedy the

moisture problem.  Mr. Gilbert believed that the small amount of mold he saw was insignificant

given the age of the house.[50]  He did not know that the entire flooring system had been replaced, and

the mold was newly formed.  Even a home inspector such as Mr. Gilbert could not tell that there was

an existing problem.  Therefore, the Court finds that the defect was unapparent and unknown by the

Sigillitos, and the Sigillitos were under no duty to investigate further.

---

[49] *Amend v. McCabe*, 664 So.2d 1183, 1188, 95-0316 (La. 12/1/95).

[50] Tr. T., July 15, 2008, p. 166-167.

14

In sum, the Claiborne House had a defect at the time of the sale[51] that was unknown to both the Sigillitos and the Hollanders, and which could not have been discovered by reasonably prudent buyers such as the Sigillitos.[52]   Accordingly, the Hollanders are bound to remedy the defect.[53]

### 1. Damages

The Sigillitos offered their list damages as Exhibit 43, and the Hollanders objected to its admission because they requested such a list of damages in state court and none was produced.   The Court will admit Exhibit 43 into evidence because the previous request was made in the state court suit.   No such discovery request or motion to compel was made in this adversary proceeding.

The Court finds that rescission is not an appropriate remedy because 1) the cost to repair is minimal in relation to the price; 2) the Sigillitos continued to make unnecessary alterations and additions to the Claiborne House at significant cost, even as they demanded rescission; 3) the Sigillitos waited two years to perform the repairs recommended by their expert; 4) the return of the Claiborne House would place the Sigillitos in the position of owning no house while holding a large unsecured claim against bankrupts; and 5) the "damages" requested are unreasonable in light of the proven cost of repairs.

Exhibit 43 lists all expenses of the Sigillitos since the act of sale; however, the Court finds that only the following expenses are attributable to the remedy of the defect:

1) Hygrometer           $106.91
2) Jeff Walters AC      $15,296.00
3) Larry Blanchette     $4,658.55
4) S&S Masonry          $977.75

---

[51] La. C.C. Art. 2530.

[52] La. C.C. Art. 2521.

[53] La. C.C. Art. 2531.

5) Turner Mechanical $1,923.65
6) United Refrigeration $3,608.57.[54]

As a result, the Hollanders must reimburse the Sigillitos for their expenses in the amount of

$26,561.43.

## B. Dischargeability

The Sigillitos allege that their claims against the Hollanders should be excepted from

discharge pursuant to 11 U.S.C. § 523(a)(2)(A) because they were incurred as a result of false

pretenses, false representations, or actual fraud.  For the debt to the Sigillitos to be nondischargeable

under section 523, they must prove by a preponderance of evidence that: (1) the Hollanders made

a representation; (2) the Hollanders knew the representation was false; (3) the representation was

made with the intent to deceive the Sigillitos: (4) the Sigillitos actually and justifiably relied on the

representation; and (5) the Sigillitos sustained a loss as a proximate result of their reliance.[55]

> Debts that satisfy the third element, the scienter requirement, are debts obtained by
> frauds involving "moral turpitude or intentional wrong, and any misrepresentations
> must be knowingly and fraudulently made."  In re Martin, 963 F.2d 809, 813 (5th Cir.
> 1992).  An intent to deceive may be inferred from "reckless disregard for the truth
> or falsity of a statement combined with the sheer magnitude of the resultant
> misrepresentation."  In re Norris, 70 F.3d 27, 30 n. 12 (5th Cir. 1995), citing In re
> Miller, 39 F.3d 301, 305 (11th Cir. 1994).[56]

---

[54] Exhibit 43.  The Court finds that most of the items listed in Exhibit 43 are not
attributable to the remedy of the defect; rather, they are attributable to living expenses,
unnecessary additions and renovations done by the Sigillitos, or to repairing problems not caused
by the defect.  For example, the Sigillitos listed costs for mortgage and utility payments, pool
maintenance, adding a dormer window, termite extermination, installation of a new air
conditioner inside, rebuilding the carport after Hurricane Katrina, and rebuilding the porches.

[55] *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir.
2005).

[56] *Id.*

The Fifth Circuit has found that a false representation does not have to be overt or spoken:

> When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required.    Moreover, a misrepresentation need not be spoken; it can be made through conduct.[57]

The Original Property Disclosure states, "Entire flooring replaced, poor millwork of initial flooring.  The Second Property Disclosure states, "Replace glued down Brazilian cherry flooring with nailed down flooring throughout the first floor."[58]   Neither disclosure statement identified the prior repairs or problems with the flooring system.

The standard realtors' disclosure statement, as it existed in 2001, required a seller to answer 25 questions and to identify in detail the circumstances surrounding any condition identified by an affirmative response to the standard questions.   Question 8 asks the seller if any alterations have been made to the home.   Question 15 asks the seller to identify any known defects in the property. The Hollanders  responded in the negative in both cases.

### 1. Question 15

The Hollanders firmly believed that the problem at the Claiborne House had been fixed.  To correct the moisture problem, they had the insulation removed, had another opening created in the chain wall, tacked visqueen under the house and had ventilation fans installed.   They replaced all damaged joists, subflooring, and the finished floor at tremendous expense.   Although the Court has concluded that the defects in ventilation persisted after the Hollanders completed the repair work, the Court is convinced that the Hollanders had no reason to believe that the house possessed a

---

[57] *A T & T Universal Card Services v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001) (citations omitted).

[58] Exhibit 15.

continuing defect.   Therefore, the Hollanders answered question 15 concerning known existing defects truthfully.

## 2. Question 8

Question 8 is more ambiguous.  Mrs. Hollander testified that she relied on her realtor to tell her what needed to be disclosed.  Their disclosure identified the replaced floors, but failed to identify the replaced floor joists and subflooring system.  While the Hollanders testified that they did not consider the repairs to the flooring system to be alterations within the meaning of the question, they also alleged that the Mendozas did not advise them to the contrary.

The Hollanders claim that the Mendozas knew of the problems with the house because they were the realtors on their Evangeline House purchase.  According to Mrs. Hollander, the Mendozas knew that they had to move out of the Claiborne House home because of the problems with the flooring system.  Mr. Hollander testified that Mrs. Mendoza tried to obtain the listing for the Claiborne House once Evangeline closed.[59]

The Mendozas testified that they did not advise the Hollanders on how to fill out the form, and the Hollanders did not ask them for advice concerning disclosure of the flooring repairs.  Mrs. Mendoza testified that she had no knowledge of the extent of the flooring problems and would have advised Mrs. Hollander to disclose them as an alteration if she did.  She also intimated that Mrs. Hollander misled her.  Mrs. Mendoza admitted that she did not define what would constitute an alteration for Mrs. Hollander, nor did she question her regarding the circumstances surrounding the flooring disclosure Mrs. Hollander did identify.

---

[59] Tr. T., August 28, 2008, p. 132.

18

Mrs. Mendoza appeared defensive on the stand while Mrs. Hollander very credible. Although the Mendozas were experienced realtors with ample knowledge of the pitfalls regarding a failure to disclose, they studiously avoided advising their clients regarding what types of repairs or conditions should be disclosed. They failed to go over the form with the Hollanders before or after it was completed to ascertain whether it was correct. They failed to ask any questions that might jog the memory or reveal a condition that should be corrected or disclosed. The Court concludes that the Mendozas did this for two reasons: first, to insulate themselves from liability or responsibility for disclosure; and second, to avoid the disclosure of a previous, but repaired, condition that might retard a sale. The Court concludes that the Mendozas kept themselves purposefully ignorant regarding the condition of the Claiborne House. However, the failure of the Hollanders to disclose cannot be whitewashed by the Mendozas' failure to discharge their professional responsibility of inquiry and advice.

The standard form is clear and unambiguous to a reader with the Hollanders' level of education.[60] The Hollanders' disclosure was misleading because it gave the impression of an entirely different cause for the flooring repair than what was known at the time. The Hollanders knew that their prior problems were caused by improper ventilation in the crawlspace. This was created by insulation nailed to the underside of the subfloor in the crawlspace, insufficient air movement in the crawlspace due to a lack of vent openings and the chain wall construction.

---

[60] Mrs. Hollander is a registered nurse, and Mr. Hollander sells health care equipment. Tr. T., August 28, 2008, p. 6 and 88.

19

An "alteration" is defined as "the act or process of altering," which is "to make different: MODIFY."[61]  The repairs to the Claiborne House included an "alteration" of the home as it is commonly understood.  Removal of a defective flooring system to the point of replacing floor joints and subfloor as well as the addition of ventilation  fans and openings in the crawlspace, all at significant cost, certainly constitute a change in the original home's design.  However, was the Hollanders' failure to disclose designed to deceive?

The Court concludes yes.  The Hollanders failure to disclose the extent of the alterations to their home was designed to avoid any chill on a potential sale.  The Court believes that the Hollanders were concerned that any disclosure of the extent of the prior flooring problem would scare off potential buyers.   This conclusion is supported in part by Mrs. Hollander's question to Quick in January 2002, when Mrs. Hollander asked whether after completing the repairs any defects would remain which should be disclosed.[62]  Quick advised that if professional recommendations were followed, there would be no more defects.[63] While the Hollanders justifiably believed that no problem existed, the failure to disclose was justifiably relied upon by the Sigillitos who had no reason to suspect the disclosure was incomplete.  A disclosure might have resulted in additional and particularized investigation and perhaps remedial repairs that would have avoided further damage.

The final element to be examined is whether the Sigillito's damages were a proximate result of the Hollander's nondisclosure.

Proximate cause is both (1) causation in fact, "loss suffered by one who justifiably relies upon the trust of the matter represented, if his reliance is a substantial factor

---

[61] Webster's II New College Dictionary.

[62] Tr. T., July 15, 2008, p. 230-232, and Exhibit 7, p. 2, ¶ 8.

[63] *Id.*

20

in determining the course of conduct that results in his loss;" and (2) legal causation, "if the loss might reasonably be expected to occur from the reliance."[64]

The damages, in the form of repairs performed by the Sigillitos were proximately caused by the Hollanders' nondisclosure because the Sigillitos would have investigated further had they known of the replaced subfloor and joists and would have either chosen not to buy the house or to have the Hollanders remedy the defect prior to sale.[65]  Either way, the Sigillitos expenses of repair would have been reduced.

Accordingly, the Court finds that the Sigillitos' claim was incurred as a result of false pretenses and is nondischargeable pursuant to section 523(a)(2)(A).

**III.  Conclusion**

The Sigillitos have a nondischargeable claim against the Hollanders in the amount of $26,561.43, plus interest at the state rate from the date of the state court demand until the date the Hollanders filed their bankruptcy petition.   The Court will enter a Judgment in accordance with this ruling.

New Orleans, Louisiana, January 14, 2009.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[64] *In re Bowden*, 326 B.R. 62, 89 (Bankr.E.D.Va. 2005) (citations omitted).

[65] Dr. Sigillito testified that they would not have bought the house if the replacement of the subfloor and joists had been disclosed.  Tr. T., July 14, 2008, p. 32.  The Court finds that the only damages incurred were the costs of repair, which are minor in relation to the price, $540,000.00.  Most of the $1,300,000 in "damages" alleged were for living expenses, payments of the purchase price through the Sigillitos' mortgage, or additions to the property.  The Court has to question the Sigillitos' request for legal rescission even as they continued to make unnecessary alterations and additions to a property they allegedly wished to tender to the buyer.

21